UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN PARALYZED VETERANS
OF AMERICA, INC., et al.,

        Plaintiffs,                     Case No. 15-cv-13046

v.                                      Paul D. Borman
                                      United States District Judge

                                      Mona K. Majzoub
                                      United States Magistrate Judge

MICHIGAN DEPARTMENT OF
TRANSPORTATION, et al.,

        Defendants.
_____/

OPINION AND ORDER DENYING DEFENDANTS WASHTENAW COUNTY
ROAD COMMISSION'S AND MICHIGAN DEPARTMENT OF
TRANSPORTATION'S MOTIONS TO DISMISS (ECF NOS. 82, 85)

        Plaintiffs, the Michigan Paralyzed Veterans of America, Inc. ("MPVA"), Ann

Arbor Center for Independent Living, Inc. ("AACIL"), National Federation of the

Blind of Michigan ("NFBMI"), Carolyn Grawi, Angie Carlson, Linda Evans, James

Briggs, Zach Damon, Jason Decamillis, A.S., a minor, through his next friend, Amy

Shepard, Larry Keeler, Maurice Jordan, Michael Harris, Lu Anne Bullington,

Christopher Cooley, Claire Abraham, and Lloyd Shelton (collectively Plaintiffs),

bring this action against the Michigan Department of Transportation ("MDOT"), Kirk

Steudle (now dismissed), in his official capacity as Director of MDOT, Washtenaw County Road Commission ("WCRC"), Pittsfield Charter Township, and Ypsilanti Charter Township (collectively Defendants), challenging the accessibility to persons with mobility and sight disabilities of certain sidewalks, curbs, and intersections allegedly under Defendants' control and supervision. Plaintiffs allege that their claims arise under: (1) Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (Title II focuses on disability discrimination in the provision of public services, while Title I focuses on the public employment sector and Title III on public accommodations) ("Title II of the ADA"), (2) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), ("§ 504 of the Rehab Act") and (3) the Michigan Persons With Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1301-02 ("the PWDCRA") (this Count not brought against MDOT, (TAC ¶ 191.G).)

MDOT now moves for dismissal of Plaintiff's ADA claim under Fed. R. Civ. P. 12(b)(1) based upon Eleventh Amendment Immunity and moves for dismissal of Plaintiffs' Rehab Act claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. WCRC moves for dismissal of Plaintiffs' ADA, Rehab Act, and PWDCRA claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The Court held a hearing on September 26, 2017. For the reasons that follow, the Court DENIES MDOT's

Motion and DENIES WCRC's Motion.[1]

## I.    BACKGROUND

Taking as true the allegations of Plaintiffs' Complaint for purposes of these motions, each of the Defendants, either alone or jointly with other Defendants, has denied Plaintiffs access to government "services, programs, activities, and facilities," by failing to provide barrier-free sidewalks and other street level pedestrian walkways running parallel to and/or crossing streets.  (Third Amended Complaint ("TAC") ¶¶ 1-2.)  Plaintiffs allege that Defendants' failures to properly construct or alter facilities in the public right-of-way ("PROW") has resulted in numerous access barriers that segregate Plaintiffs, who suffer from mobility and sight disabilities, from safely using sidewalks, crossing streets, accessing public transit, and reaching area businesses, including polling places, offices of the Secretary of State, the Michigan Department of Human Services, the University of Michigan Family Health and Practice Center, the Washtenaw County Mental Health Center, the Pittsfield Township Senior Center, the Washtenaw County Resource Center and Court Complex, Ypsilanti City Hall, Eastern Michigan University, the Ypsilanti District Library, the Salvation Army Food

---

[1] Plaintiffs stipulated, at the September 26, 2017 hearing, to dismiss their ADA claim against MDOT. Accordingly the Court need not reach MDOT's Eleventh Amendment Immunity argument, which the parties agree applied only to Plaintiffs' claim against MDOT under the ADA. The Court will therefore DENY MDOT's motion to dismiss Plaintiffs' ADA claim as MOOT.

Bank, and many other government programs, services or activities. (TAC ¶¶ 12, 19P-Z.)

The claims against Defendant MDOT are limited to a geographic area defined by the borders of Ypsilanti Charter Township, Pittsfield Charter Township, the City of Ann Arbor, the City of Ypsilanti, or the City of Saline. (TAC ¶ 4.) Within these geographic boundaries, the "services, programs, activities, or facilities" that Plaintiffs challenge are trunkline highways, including the sidewalks or other street level pedestrian walkways, pedestrian-transit stops, pedestrian crossings, curb cuts, curb ramps, and walks either crossing these state trunkline highway portions, or running parallel to the state trunkline highways located inside MDOT's right-of-way. (TAC ¶ 4.) This also includes bridges or overpasses for which MDOT has jurisdiction within these geographic boundaries. (*Id*.) Also included are those portions of walks, streets, roads, highways, or facilities that have been constructed or altered, by or on behalf of, or for the use of, MDOT after January 26, 1992, specifically Packard Road in Ann Arbor, from Platt to Route 23, the contract for which MDOT awarded the bid. (*Id*.)

Plaintiffs' claims against Defendant WCRC are limited solely to WCRC's "services, programs, activities, or facilities" altered or located within the geographic boundaries of Ypsilanti Charter Township, Pittsfield Charter Township, the City of

Ann Arbor, the City of Ypsilanti or the City of Saline.  (TAC ¶ 4.A.)  Within these geographic boundaries, the "services, programs, activities, or facilities" that Plaintiffs challenge are the streets, roads and highways over which WCRC has jurisdiction, including the sidewalks or other street level pedestrian walkways, pedestrian-transit stops, pedestrian crossings, curb cuts, curb ramps, and walks either crossing these streets, roads, or highway portions or running parallel to them or located inside a WCRC right-of-way. (*Id*.)  Also included are those portions of these walks, streets, roads, highways or facilities which have been constructed or altered by, on behalf of, or for the use of WCRC after January 26, 1992.  (*Id*.)

Plaintiffs MPVA and AACIL are organizations that represent veterans and other persons with disabilities throughout Washtenaw County who have been discriminated against and subjected to hazardous conditions due to the access barriers at issue in this case. (TAC ¶ 13.)   Plaintiff NFBMI is a state-wide non-profit membership organization with the mission of helping blind individual members lead richer, more meaningful lives, gain fuller independence, and achieve first-class citizenship.  (TAC ¶ 19.B.) Each of these organizational Plaintiffs has employees, members, volunteers, consumers, or clients who suffer from a sight or mobility disability who live, work, or travel on the Defendants' streets, roads and highways and their adjacent walks and facilities who could bring this lawsuit individually, some of whom are individual

Plaintiffs in this action. (TAC ¶¶ 19, 19.A-N.) The individual Plaintiffs, each of whom is a person with a mobility or sight disability, each lives, works, or frequently travels for business or pleasure throughout Washtenaw County, Michigan. (TAC ¶ 13.A.) Each Individual Plaintiff is a "qualified person with a disability" as defined under the ADA, the Rehab Act, and the PWDCRA, and has been denied access to one or more of the Defendants' facilities, programs, services, or activities and continues to suffer harm and will benefit from the relief sought in the TAC. (TAC ¶ 21-22.)

## II.    STANDARD OF REVIEW

When reviewing a motion to dismiss under Rule 12(b)(6) a court must "'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff.'" *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal quotation marks and citations omitted). *See also Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.").

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court

6

explained that "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id*. at 555 (internal quotation marks and citations omitted) (alteration in original). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).

The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), explaining that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 678." Thus, "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible. Bare assertions of legal liability absent some corresponding facts are insufficient to state a claim." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In ruling on a motion to dismiss, the Court may consider the complaint as well

as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (Internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings. . . . [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett-Packard Co*., 258 F. Supp. 2d

718, 721 (E.D. Mich. 2003). "Otherwise, a plaintiff with a legally deficient claims could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais and Co., Inc*., 108 F.3d 86, 89 (6th Cir. 1997).

## III. ANALYSIS

Plaintiffs' Complaint contains significant detail regarding the specific portions of the highways, roads, streets, and pedestrian walkways that are the subject of their TAC, and regarding the source of funds utilized to construct or alter them, as well as detail regarding the particular barriers to access that the Individual Plaintiffs have encountered. These allegations, taken as true at this pleading stage, sufficiently allege that each of the Defendants has been the recipient of federal funds and has actively either constructed, altered, failed to maintain, or otherwise adversely affected the accessibility of, "sidewalks, street crossings, street level transit stops, and certain other facilities, services, programs, and activities" that are under their "sole or joint jurisdiction." (TAC ¶¶ 14-17.) Defendants argue that none of these allegations, even taken as true, allege either facility inaccessibility or service inaccessibility that rises to the level of a denial of meaningful access to a public service under the ADA, the Rehab Act, or the PWDCRA, and therefore do not state a claim upon which relief can be granted.

The Court disagrees and finds that Plaintiffs have plausibly alleged claims

under the ADA, the Rehab Act and the PWDCRA against these Defendants. Recently, in *Mote v. City of Chelsea*, 252 F. Supp. 3d 642 (E.D. Mich. 2017), Judge David Lawson of this District addressed these same claims asserted by a different set of disabled plaintiffs, and analyzed these same arguments for dismissal made by MDOT and WCRC, and found plausible claims had been alleged under the ADA, the Rehab Act and the PWDCRA. This Court finds persuasive, and agrees with, Judge Lawson's reasoning and conclusions in *Mote*, as discussed at length below.

**A.    The ADA, the Rehab Act, and the PWDCRA - Parallel Analytical Frameworks**

As most United States Circuit Courts of Appeal, including the Sixth Circuit have acknowledged, the ADA and the Rehab Act are materially indistinguishable except that the Rehab Act requires evidence of receipt of federal funding. "Our analysis of Rehabilitation Act claims 'roughly parallels' ADA claims because the statutes contain similar language and are 'quite similar in purpose and scope.'" *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) (quoting *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459-60 (6th Cir. 1997)). *See also Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir. 2004) ("[W]e have held that '[t]he analysis of claims under the [ADA] roughly parallels those brought under the Rehabilitation Act."); *Frame v. City of Arlington*, 657 F.3d

215, 223-24 (5th Cir. 2011) ("The ADA and the Rehabilitation Act generally are interpreted *in pari materia*. Indeed, Congress has instructed courts that nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to such title.") (Internal quotation marks and citation omitted) (alterations in original). "In light of these similarities" the Sixth Circuit has recognized that "cases construing one statute are instructive in construing another." *Ability Center*, 385 F.3d at 908. "The same can be said of the [PWDCRA]. It substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve plaintiff's PWDCRA claim." *Mote*, 252 F. Supp. 3d at 649 (internal quotation marks and citation omitted).

In *Ability Center*, the Sixth Circuit summarized the requirements of Title II of the ADA, and explained certain of its implementing regulations, as follows:

> Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 202, 42 U.S.C. § 12132. "Public entity" includes "any state or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." § 201, 42 U.S.C. § 12131(1)(A) & (B). The Act grants the Attorney General authority to promulgate regulations to implement its provisions. § 204, 42 U.S.C. § 12134. Pursuant to § 204, the Attorney General adopted 28 C.F.R. § 35.151, which provides that alterations of facilities commenced

after January 26, 1992, "by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities." *Id*. § 35.151(b). The regulation further specifies that alterations should meet certain accessibility standards, id. § 35.151(c), and that altered streets and pedestrian walkways must contain curb ramps. *Id*. § 35.151(e). Section 35.151 is part of a broader regulatory scheme that aims to effectuate § 202 of the ADA. See 28 C.F.R. § 35.101. [Available at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm]. The scheme makes explicit that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." *Id*. § 35.149 (emphasis added).

385 F.3d at 903-04 (alteration added). "For new constructions or alterations commenced before September 15, 2010, public entities could choose to comply either with the original 1991 ADAAG [Americans with Disabilities Act Accessability Guidelines] standards or with another set of federal standards called the Uniform Federal Accessibility Standards ("UFAS"). 28 C.F.R. § 35.151(c)(1)." *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1177 (9th Cir. 2017) (alteration added). "New constructions or alterations commenced between September 15, 2010, and March 15, 2012, could comply with the 1991 ADAAG standards, with UFAS, or with the newly adopted 2004 ADAAG standards. *Id*. § 35.151(c)(2). And new constructions or alterations commenced after March 15, 2012, had to comply with the

12

2004 ADAAG standards. *Id*. § 35.151(c)(3)." *Ibid*. Section 35.151 requires, in relevant part, that "[n]ewly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway," and that "[n]ewly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways." 28 C.F.R. 35.151(i).[2]

28 C.F.R. § 35.150(a) provides that public entities must "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Kirola,* 860 F.3d at 1182. "Meeting this standard does not '[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities.'" *Ibid.* (quoting § 35.150(a)(1)). "It also does not require structural changes to existing facilities, if 'other methods, such as relocating services to different

---

[2] Although the parties do not appear to dispute which version(s) of the Department Of Justice (DOJ) regulations are at issue here, a helpful history of the ADAAG and UFAS standards, and the DOJ adoptions of various iterations of those standards, is well-summarized by the Ninth Circuit in *Kirola*, 860 F.3d at 1176-77 (citing *Miller v. Cal Speedway Corp*., 536 F.3d 1020 1024-27 (9th Cir. 2008)). The ADAAG standards are created by a federal agency, the Architectural and Transportation Barriers Compliance Board, and only become binding when adopted by the DOJ, which has occurred at least twice since the ADA was passed in 1990. *Id.*

buildings, would be effective.'" *Ibid*. (quoting *Cohen v. City of Culver City*, 754 F.3d 690, 696 (9th Cir. 2014); 28 C.F.R. § 35.150(b)(1)). "The regulation requires only that, 'when viewed in its entirety,' the program at issue be accessible." *Ibid*. at 1182-83.

"Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding. Like Title II, § 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Frame*, 657 F.3d at 223. "Congress intended to make clear that the receipt of federal funds, even for the purpose of distribution to others, was sufficient to voluntarily waive Eleventh Amendment immunity from Rehabilitation Act claims against the departments or agencies that accepted the funds." (MDOT's Mot. 33, PgID #2061.) MDOT does not contest that it has waived immunity for purposes of claims asserted under the Rehab Act. The Rehab Act defines a "program or activity" as "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A).

Plaintiffs' TAC alleges that both MDOT and the WCRC have individually and or jointly undertaken to construct and/or alter numerous sidewalks and pedestrian

walkways running parallel to and/or crossing various streets and highways without complying with the mandates of these regulations, resulting in an actionable denial of meaningful access under the ADA, the Rehab Act and the PWDCRA.

### B. MDOT'S Motion to Dismiss

Plaintiffs allege that MDOT, in a defined geographic area specific to the claims of these Plaintiffs, maintains "services, programs, activities, or facilities" comprised of certain trunkline highways, including the sidewalks or other street level pedestrian walkways, pedestrian-transit stops, pedestrian crossings, curb cuts, curb ramps, and walks either crossing these state trunkline highway portions, or running parallel to the state trunkline highways located inside MDOT's right-of-way, and has denied Plaintiffs access to government "services, programs, activities, and facilities," by failing to provide barrier-free sidewalks and other street level pedestrian walkways running parallel to and/or crossing these PROWs. Also included are bridges or overpasses over which MDOT has jurisdiction and any portions of walks, streets, roads, highways, or facilities that have been constructed or altered, by or on behalf of, MDOT after January 26, 1992. (TAC ¶¶ 4, 16, 24-51.) Plaintiffs argue that the building and altering of these sidewalks and other pedestrian thoroughfares in the PROW are "services" under the ADA of a public entity. Specifically as to any PROW that has been built or altered by MDOT after January 26, 1992, MDOT was required

to comply with the regulations promulgated by the Department of Justice ("DOJ") under the ADA, 28 C.F.R. § 35.151.

MDOT takes the position, relying primarily on the Sixth Circuit's reasoning in *Babcock*, *supra*, that sidewalks and other pedestrian thoroughfares, while serving as access routes to public facilities offering public services, activities, and programs, are not "services, activities, or programs," under Title II and that Title II does not protect public access to "facilities" as opposed to public access to a "service, activity, or program." To resolve the issue of whether Plaintiffs' allegations plausibly allege a Title II claim under the ADA the Court considers two opinions, one precedential and one persuasive, that address this issue: (1) In *Ability Center*, the Sixth Circuit expressly held that the regulations promulgated under the ADA, imposing affirmative obligations on public entities to install curb ramps on sidewalks, clearly effectuated the goals of Title II and thus could be enforced in the courts through a private cause of action against a public entity. 385 F.3d at 907 ("We find that 28 C.F.R. § 35.151 effectuates a mandate of Title II and is therefore enforceable through the private cause of action available under the statute."); and (2) In *Mote*, *supra*, a case alleging facts similar to those alleged by Plaintiffs here and litigated by the same Plaintiffs' counsel on behalf of a different set of plaintiffs against the MDOT and WCRC, Judge Lawson concluded, relying in part on *Ability Center*, that providing and maintaining pedestrian

thoroughfares in the form of sidewalks is itself a public service under the ADA and that, even if not properly characterized as a "service," entities that construct and maintain sidewalks and curbs that fail to satisfy the regulations adopted pursuant to the ADA and that deny disabled persons access to a host of public services are subject to suit under Title II of the ADA. *Mote*, 252 F. Supp. 3d at 653-54.

In *Ability Center*, plaintiffs alleged that the City of Sandusky, in the process of replacing and repairing certain sidewalks and street curbs, violated Title II of the ADA by failing to install proper curb cuts and ramps in accordance with the regulations promulgated pursuant to Title II, specifically 28 C.F.R. § 35.151.[3] 385 F.3d at 903. The relevant regulations, promulgated by the Attorney General to implement the provisions of Title II and discussed *supra*, provide that any alterations of "facilities," defined in the regulations to include "roads, walks, passageways, parking lots" (*see* 28 C.F.R. § 35.104), by a "public entity," defined as any state or local government or

---

[3] The applicable regulations require that "[e]ach facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992." 28 C.F.R. § 35.151(a)(1). Specifically with respect to curb ramps, a significant focus of Plaintiffs' allegations here, § 35.151 expressly requires that "(1) [n]ewly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway," and "(2) [n]ewly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways." 28 C.F.R. § 35.151(i).

other instrumentality of State or local government (*see* 42 U.S.C. § 12131(1)(A)(B)), commenced after January 26, 1992, must meet certain accessibility standards including specifically curb ramps on pedestrian walkways. 385 F.3d at 904. Defendants moved for summary judgment, arguing that the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), established that Title II does not provide private parties a cause of action for pursuing violations of § 35.151. *Id*. at 903. Defendants did not dispute that they failed to comply with § 35.151, nor did they challenge the reasonableness or validity of the regulations. They argued only that Title II provided for a private cause of action only for "intentional" discrimination and therefore the affirmative architectural requirements of § 35.151 could not be imposed on the Defendants through a private action for injunctive and declaratory relief. *Id*. at 906.

The Sixth Circuit disagreed, noting that *Sandoval* stands only for the proposition that "a private plaintiff cannot enforce a regulation through a private cause of action generally available under the controlling statute if the regulation imposes an obligation or prohibition that is not imposed generally by the controlling statute." 385 F.3d at 906. "On the other hand, if the regulation simply effectuates the express mandates of the controlling statute, then the regulation may be enforced via the private cause of action available under that statute." *Ibid.* Rejecting Defendants' contention

that Title II sought to prohibit only "intentional" discrimination, the Sixth Circuit

concluded that § 35.151 was enforceable through a private cause of action:

> We find that 28 C.F.R. § 35.151 effectuates a mandate of Title II and is therefore enforceable through the private cause of action available under the statute. Title II does more than prohibit public entities from intentionally discriminating against disabled individuals. It also requires that public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide. Moreover, Title II contemplates that such accommodations must sometimes come in the form of public entities removing architectural barriers that impede disabled individuals from securing the benefits of public services.

385 F.3d at 907. The Sixth Circuit further observed:

> Title II mandates not only that public entities refrain from intentionally discriminating against disabled individuals but that they also make certain accommodations to the disabled in the course of providing public services, which should include removing architectural barriers in the manner prescribed by 28 C.F.R. § 35.151.

> *          *          *

> Most importantly, our conclusion is supported by the text of Title II. Title II and the ADA more broadly were motivated in part by Congress's finding that, in addition to "outright intentional exclusion," individuals with disabilities also suffer from indirect forms of discrimination, such as "the discriminatory effects of architectural, transportation, and communication barriers,... [and] failure to make modifications to existing facilities." 42 U.S.C. § 12101(a)(5) (emphasis added). Congress stated that the purpose of the ADA was to eliminate such discrimination, in part by using its power "to enforce the fourteenth amendment and to regulate commerce [ ] in order to address the major areas of discrimination faced day-to-day by people with disabilities." *Id.* § 12101(b)(1) & (4). Such language shows that Congress, aside from merely hoping to curtail

intentional discrimination against the disabled, aimed to improve the quality of the lives of the disabled by requiring that public entities—as well as other entities subject to the Act's requirements—eliminate barriers to physical access, including barriers inherent in existing facilities.

385 F.3d at 908, 909 (alteration in original).

In *Mote*, relying in part on *Ability Center*, Judge Lawson reached this same conclusion on facts largely indistinguishable from the allegations made here:

[T]he MDOT and WCRC ignore the command of 28 C.F.R. § 35.151. The crux of the plaintiffs' amended complaint is that, due to numerous specific accessibility defects in the curbs, roadways, parking spaces and lots, and sidewalks within the City of Chelsea, they are unable safely to navigate the City's pedestrian throughways, and they have been denied the full enjoyment and benefit of the City's public services such as municipal parking, parades, and City-sponsored festivals. The plaintiffs also allege that the sidewalk and curb defects make it impossible for them to traverse some public pedestrian routes at all, or to access certain public buildings such as the library. They contend that the problems have in some cases been caused by the removal of accessibility features that already were present. And they maintain that the City, State, and County all have ignored the positive, specific mandate of 28 C.F.R. § 35.151, which required those entities, when building or repairing various public sidewalks after January 1992, affirmatively to ensure that the design and construction of those features adhered to specific technical provisions of the ADA Accessibility Guidelines.

252 F. Supp. 3d at 650. Judge Lawson rejected the identical arguments that MDOT makes here, noting that *Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005), which relied on *Ability Center*, "considered and squarely rejected the position that the State and County now take here, holding instead that a plaintiff has a private

right of action to pursue her claims based on the failure of [a city] to comply with regulations concerning the accessibility of facilities." *Id.* at 652. Judge Lawson denied the MDOT and WCRC's motions to dismiss Plaintiffs' Title II claims, concluding:

> Any sensible reading of ADA Title II compels the conclusion that maintaining public pedestrian thoroughfares for citizens to get around a city—and access the many public services and businesses located within—is the archetypal example of the most fundamental of public services. Inaccessible sidewalks are, in fact, the single most readily conceivable example of a basic obstacle to accessibility that comes to mind when considering the purpose that animates the ADA, which is to eliminate obstacles to the full enjoyment of public life by disabled citizens. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) ("To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life ...."). It is simply common sense: If disabled pedestrians cannot access the sidewalks, then they can hardly access anything else that a city has to offer.

252 F. Supp. 3d at 654.

*Ability Center* and *Mote* thus pave the way for this Court's determination that Plaintiffs' claim that MDOT, with respect to numerous projects commenced after January 26, 1992, has failed to comply with § 35.151 by constructing and/or altering pedestrian walkways under its supervision and control without ensuring compliance with the regulation's accessibility guidelines, states a claim under Title II that is enforceable through a private action. MDOT makes no attempt to distinguish *Mote*, stating only in a cursory footnote that MDOT believes *Mote* was wrongly decided.

(ECF No. 85, MDOT's Mot. 14 n. 2, PgID #2042.)  MDOT argues that the Sixth

Circuit's decision in *Babcock*, *supra*, establishes that Title II protects access only to

"a public service, program, or activity," and that a claim alleging inaccessibility to a

*facility* is not cognizable under Title II : "[A]n allegation that a plaintiff encountered

barriers or difficulties using a facility, or was even completely denied access to a

facility, does not state a claim under Title II."  (MDOT's Mot. 12, PgID # 2040.)

The Court rejects this overbroad reading of *Babcock*, an interpretation that is

unsupported by Judge Richard Griffin's majority opinion in *Babcock* and directly at

odds with Judge John Rogers' concurring opinion, which anticipated the argument

that MDOT makes here and cautioned that it was likely untenable in the wake of

*Ability Center*, Title II's implementing regulations, and the DOJ's amicus briefs that

have been filed in several sidewalk cases.  812 F.3d at 543 (Rogers, J. concurring).

The plaintiff in *Babcock* was an attorney who worked at the Cadillac Place (formerly

the General Motors building), a structure owned by an agency of the State of

Michigan, that housed various state offices, including a court of appeals.  812 F.3d at

532.  Plaintiff alleged that various design features of Cadillac Place, such as the slope

of ramps at the building entrance and the lack of handrails, denied her equal access to

her place of employment in violation of Title II of the ADA and the Rehab Act.  *Id.*

532-33.  The Sixth Circuit first addressed the issue of whether Babcock's ADA claim

was barred by Eleventh Amendment Immunity. Applying the tripartite framework for analyzing claims of Eleventh Amendment Immunity set forth by the Supreme Court in *United States v. Georgia*, 546 U.S. 151 (2006), the court first examined "which aspects, if any, of defendants' alleged conduct violated Title II." *Id*. at 535.

The Sixth Circuit observed that "the focus of Title II is access to services, programs, and activities," and that "Title II's private right of action is specifically intended to remedy interference with a disabled individual's participation in, or benefitting from, a public service, program, or activity." *Ibid.* (citing *San Francisco v. Sheehan*, 135 S. Ct. 1765, 1773 (2015) and *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998)). The court interpreted Babcock's claim as "arguing that the design features identified in her complaint, such as the slope of ramps and lack of handrails, are services, programs, or activities for purposes of the ADA Title II." *Id*. at 535. Examining regulations promulgated under the ADA that implied a distinction between "a facility and an activity conducted in that facility," and a series of sister-circuit opinions suggesting the same distinction, the court concluded:

> These regulations strongly suggest that a private cause of action exists to remedy the exclusion from participating in or deriving benefit from public services, programs, or activities, but not remedy the lack of certain design features of a facility. This is not to suggest that the ADA does not extend to the alleged design defects of Cadillac Place, but merely that plaintiff may not remedy them through private action without alleging interference with a service, program, or activity.

$$*\qquad\qquad *\qquad\qquad *$$

> These decisions are consistent with our view that facility accessibility is
> not, standing alone, a cognizable claim under Title II's private right of
> action; rather, the inquiry is tied to whether that facility's inaccessibility
> interferes with access to public services, programs, or activities.

812 F.3d at 536.

The majority opinion in *Babcock* relied in part on the dissenting opinion of seven judges on a Fifth Circuit *en banc* panel in *Frame*, *supra*. The plaintiffs in *Frame*, like the Plaintiffs here, were mobility disabled and alleged "that certain inaccessible sidewalks [many of which had been built or altered after Title II's regulations became effective on January 26, 1992] made it dangerous, difficult, or impossible for them to travel to a variety of public and private establishments throughout the City." 657 F.3d at 221. The majority opinion in *Frame*, citing the Sixth Circuit's opinion in *Ability Center* and three other like-minded circuit court decisions as support, concluded that the plaintiffs had a private right of action to enforce the DOJ's regulations governing newly built and altered sidewalks. *Id.* at 233.

The dissent in *Frame*, in a more plain-text based approach, focused on the characterization of sidewalks in the statute and the regulations as "either a barrier to transportation, or a facility, or both," and concluded that "[b]ecause a sidewalk is a facility – not a service – the sidewalk regulations are privately enforceable only if an

inaccessible sidewalk effectively denies a disabled individual meaningful access to a public service." *Id*. at 242-43. However, as Judge Rogers noted in his concurring opinion in *Babcock*, "the *Frame* dissent may be in some tension with *Ability Center*." 812 F.3d at 543. Indeed, Judge Rogers concurred in *Babcock* to specifically leave open the possibility that sidewalks may qualify as "services:"

> Babcock's complaint fails to state a claim because she has not alleged what parts of Cadillac Place have undergone renovations that would trigger § 35.151, and she has not identified the services, programs, or activities that she intends to access. It is true that in *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 913 (6th Cir. 2004), we held that § 35.151 provides a private right of action against defendants who do not comply with that regulation's requirements. Nothing in this analysis questions that proposition. In short, Babcock's complaint does not identify any service, program, or activity that 42 U.S.C. § 12132 aims to protect. Thus, even if § 35.151 requires that certain design features of the building here conform to specific architectural requirements, Babcock's complaint does not state a claim. On this basis, the majority opinion is correct.

> While the majority relies substantially on the reasoning of the *Frame* dissent, the majority in this case carefully notes ways in which the case of sidewalks may be different from the building designs before us. *Ante*, at 538 n. 5. Our decision today thus does not necessarily control a future case involving sidewalks. There is some room for the possibility that sidewalks may qualify as services even if the design features of a building do not. A city's sidewalks are more critical to the everyday transportation needs of the general public than are the design features of a specific building. The conclusion that sidewalks may qualify as a service is supported by a 2004 decision from this court [*Ability Center*], a Title II implementing regulation, and the Justice Department's amicus briefs in several sidewalk cases. Our judgment today does not resolve the question.

812 F.3d at 543 (alteration added). Thus, as Judge Lawson noted in *Mote*, the *Babcock* majority opinion did not purport to overrule *Ability Center*, and indeed never mentioned the regulations that were the subject of dispute in *Ability Center* and that are at the heart of Plaintiffs' claims here. *Babcock* did not present the issue of construction or alteration of curbs and sidewalks in the post-January 26, 1992 era. *Babcock* addressed the architectural features of an existing building to which, the court concluded, § 35.151 does not apply. As Judge Rogers noted in his concurrence, the *Babcock* majority went out of its way to suggest that its opinion and the *Frame* majority could be reconciled:

> The Fifth Circuit's majority opinion [in *Frame*] rests on two alternative grounds. First, the act of building or altering public sidewalks is a "service." Babcock does not advance such an argument with respect to the alleged design defects of Cadillac Place, so we need not address it. The second ground is the majority's conclusion that "services" encompasses the sidewalks themselves under the plain meaning of the statute. *Id*. at 225–28. Relying on the Supreme Court's use of the term "services" and various dictionary definitions, the *Frame* majority emphasized that the public has a "general demand" for "safe transportation," *id*. at 226–27 (emphasis added), and so a "sidewalk" qualifies as a "service." That reasoning is inapplicable here. In this case, we face the question of whether certain design features in a building—for example handrails at entrances—qualify as a "service." Those design features do not satisfy a "general demand" for "safe transportation" in the same way that a sidewalk does; instead, these features are intended for a subset for the general population entering Cadillac Place. Put another way, these design features are not ordinarily "provided in common to all citizens," *id*. at 227, so we are hard-pressed to conclude that they qualify as "services," like sidewalks under the Fifth

Circuit majority's approach.

> Even accepting the logic of the majority, the design features of a facility like Cadillac Place are distinguishable from sidewalks. While a sidewalk might more reasonably fall within the gray area between a "facility" and "service," the nature of the walls and floors of Cadillac Place are quintessential examples of the features of a facility, *see* 28 C.F.R. § 35.104, as opposed to a service, program, or activity. For the reasons stated by the dissent and outlined above, we find the dissent's interpretation more persuasive.

812 F.3d at 538 n. 5. Indeed, as Judge Rogers noted in his concurrence, certain regulations strongly suggest that a public entity has the obligation to provide accessibility of public sidewalks in all pedestrian walkways, and not just those that serve as a gateway to another governmental service, program, or activity:

> Also supporting the view that a sidewalk may qualify as a service is a provision in the existing-facilities regulation. That provision states that public entities should "provid[e] curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act, including State and local government offices and facilities, transportation, places of public accommodation, and employers, *followed by walkways serving other areas*." 28 C.F.R. § 35.150(d)(2) (emphasis added). This provision suggests that a public entity has a duty to install curb ramps in all sidewalks, even if the sidewalk does not serve as a "gateway" to another governmental service, program, or activity. As the Ninth Circuit has put it, "Section 35.150's requirement of curb ramps in all pedestrian walkways reveals a general concern for the accessibility of public sidewalks." *Barden v. City of Sacramento*, 292 F.3d 1073, 1077 (9th Cir. 2002) (emphasis added).

812 F.3d at 543-44. Finally, as Judge Rogers also noted in his concurrence in *Babcock*, an agency's interpretation of its own regulations is entitled to substantial

deference, and the DOJ has firmly stated in several amicus filings on this issue that the provision and maintenance of sidewalks, curbs, and parking lots qualifies as "services, programs, or activities," under Title II of the ADA. 812 F.3d at 544.

The Sixth Circuit has long recognized that the ADA's "phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). Indeed, as the Sixth Circuit observed in *Johnson*, "this broad reading of 'program, services, and activities' is consistent with the broad definition used in § 504 of the Rehabilitation Act ("the term 'program or activity' means all of the operations")." 151 F.3d at 570 (quoting 29 U.S.C. § 794(b)). "This is significant," the Sixth Circuit commented, "because we look to the Rehabilitation Act for guidance in construing similar provisions in the Americans With Disabilities Act." *Id.* Likewise, the Ninth Circuit in *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002), relying in part on the Sixth Circuit's broad definition of the terms "program, services, and activities" in *Johnson*, expressly held that sidewalks are subject to the accessibility regulations promulgated pursuant to the ADA:

> [The District Court] held that the public sidewalks in Sacramento are not a service, program, or activity of the City and, accordingly, are not subject to the program access requirements of either the ADA or the Rehabilitation Act. . . . The district court's order was based on its conclusion that sidewalks are not a service, program, or activity of the

City. Rather than determining whether each function of a city can be characterized as a service, program, or activity for purposes of Title II, however, we have construed the ADA's broad language [as] bring[ing] within its scope 'anything a public entity does. . . . This broad construction of the phrase, "services, programs, or activities," is supported by the plain language of the Rehabilitation Act because, although the ADA does not define "services, programs, or activities," the Rehabilitation Act defines "program or activity" as "all of the operations of" a qualifying local government. 29 U.S.C. § 794(b)(1)(A).

. . .

Requiring the City to maintain its sidewalks so that they are accessible to individuals with disabilities is consistent with the tenor of § 35.150, which requires the provision of curb ramps, "giving priority to walkways serving" government offices, "transportation, places of public accommodation, and employers," but then "followed by walkways serving other areas." 28 C.F.R. § 35.150(d)(2). Section 35.150's requirement of curb ramps in all pedestrian walkways reveals a general concern for the accessibility of public sidewalks, as well as a recognition that sidewalks fall within the ADA's coverage, and would be meaningless if the sidewalks between the curb ramps were inaccessible.

*Barden*, 292 F.3d at 1076-77 (internal quotation marks and case citations omitted).

In *Babcock*, the majority expressly referenced *Johnson* and observed that the "decision in this case should not be viewed as inconsistent with our court's broad interpretation of the phrase "services, programs, and activities," to "encompass[ ] virtually everything that a public entity does." 812 F.3d at 540 (quoting *Johnson*, 151 F.3d at 569).  And Judge Rogers' concurrence cites *Barden* for the proposition that "a public entity has a duty to install curb ramps in all sidewalks, even if the sidewalk does not serve as a "gateway" to another governmental service, program, or activity."

812 F.3d at 543.  Not only did the Sixth Circuit in *Babcock* leave open the possibility that sidewalks could be considered "services, programs, or activities" under the ADA – it strongly suggested this conclusion, which this Court reaches today.

MDOT makes a host of other arguments for dismissal under 12(b)(6) that the Court rejects at this pleading stage: (1) that the Plaintiffs have alleged no "actual denial" of access.  As the Fifth Circuit noted in *Frame*, Article III requires "actual or imminent" and not merely "conjectural or hypothetical" injury.  "But imminence is an elastic concept that is broad enough to accommodate challenges to at least some sidewalks that a disabled person has not personally encountered."  *Frame*, 657 F.3d at 235.  "[A] disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that an inaccessible sidewalk actually affects his activities in some concrete way."  *Id*. at 236.  Plaintiffs allegations here are sufficient to pass this threshold requirement and support their right to file these claims; (2) that MDOT is not required under its authorizing regulations to install curb ramps at every intersection and is not prohibited from removing curb ramps.  Again, at this pleading stage the Court must credit the Plaintiffs' factual allegations which assert otherwise – these are matters to be addressed on a more developed evidentiary record; (3) MDOT is required only to construct, improve, and maintain the state trunkline highway and is not responsible for accessibility issues outside the realm of

its authority. This may be true, but the fact is that Plaintiffs have pleaded otherwise and have pleaded that MDOT has resurfaced roads, constructed new curb cuts, constructed sidewalks, *see, e.g.* TAC ¶¶ 27-51, and suggests on its website that its services include constructing and maintaining these features. Again, MDOT can contest this characterization of their conduct at an appropriate stage of this litigation, but cannot do so on a motion to dismiss.

MDOT argues that even if sidewalks, curb ramps, curb cuts and the like are considered "services, programs, or activities" under the ADA, Plaintiffs have not alleged a denial of "meaningful access" because they have not alleged a denial of access to this network when viewed *in its entirety*. MDOT relies on the Ninth Circuit's conclusion in *Kirola* that, although sidewalks in the PROW are services, the plaintiffs there "did not establish inaccessibility at a programmatic level." 860 F.3d at 1183. Because "no class member testified that there were locations in the city that such class members could not reach because of access barriers," and because the expert testimony introduced at trial described the inaccessibility of only "a small part" of the city's network of sidewalks, street corners, and intersections, the evidence failed to meet the standard which required that the service be inaccessible or unusable when "viewed in its entirety." *Ibid.* First, it is important to note that *Kirola* proceeded to a full trial on the merits before this determination regarding programmatic

accessibility was made by the trial court.  Second, and of greater importance, the

evidence found lacking in *Kirola*, i.e. testimony regarding the inability of individual

plaintiffs to reach certain locations because of access barriers, has been alleged here,

by numerous Plaintiffs regarding a multitude of public places in the relevant

geographic area.  (*See, e.g.*, TAC ¶ 19.)  At this pleading stage, these allegations are

taken as true and only discovery will reveal the full breadth and scope of the alleged

inaccessibility, assuming such a finding is even relevant to establishing an ADA or

Rehab Act violation.

### C.     WCRC'S Motion to Dismiss

The WCRC moves to dismiss for many of the same reasons already rejected by

the Court in reaching its conclusion that Plaintiffs have stated claims under the ADA

and the Rehab Act against MDOT.  *See generally Mote*, *supra* (denying motions to

dismiss by both MDOT and WCRC on virtually indistinguishable claims).  The

Court's analysis of those issues is equally applicable to the WCRC, a local

governmental unit which cannot and does not claim any type of immunity from suit.

Indeed, in an Order issued on September 22, 2017, Magistrate Judge Mona Majzoub

rejected many of the arguments interposed by the WCRC here.  (ECF No. 43, Order

at § IIIA.)  The WCRC did not object to or otherwise appeal that decision to this

Court.[4]

Plaintiffs have alleged that "WCRC has been and continues resurfacing streets and building hundreds inaccessible curb ramps, bus stops and sidewalks. (Third Amended Complaint, ECF 78 and captioned photographs attached thereto ECF 78-1 and 78-2). At many intersections, defendant is actually removing long-existing curb ramps and replacing them with grass and a solid curb. *Id*. Every year, it endangers motorists and pedestrians alike with shocking, inattentive construction zones, for months at a time. *Id*. It is as if defendant totally ignores Title II and Section 504. But

_____

[4] The WCRC frames its argument in terms of "standing," arguing that Plaintiffs will be unable to demonstrate "that the county-wide system of sidewalks and pedestrian walkways is inaccessible and unuseable in its entirety." (ECF No. 82, WCRC Br. 11, PgID 1962.) WCRC conflates the concept of standing with whether Plaintiffs should prevail on the merits, as the district court did in *Kirola*:

> The district court seems to have improperly conflated Kirola's standing with whether she should prevail on the merits. . . . Meaningful access to a program "in its entirety" is the standard for relief *on the merits* of Kirola's program access claims. . . . The standard for injury in fact is whether Kirola has encountered at least one barrier that interfered with her access to the particular public facility and whether she intends to return or is deterred from returning to that facility.

860 F.3d at 1175. Plaintiffs have sufficiently pleaded such facts here, alleging that the Defendants' failures to properly construct or alter facilities in the PROW have prevented individual Plaintiffs in specific circumstances from safely navigating sidewalks, crossing streets, accessing public transit, and ultimately reaching area public businesses. This is concrete and particularized harm that could be redressed by the injunctive relief that Plaintiffs seek. Article III standing has been sufficiently established. *Id*. at 1175-76.

the truth is, defendant pays attention to some of the ADA—by installing some curb ramps— but it stops far short from Congress' mandates for accessibility and its requirements for providing federal funding." (ECF No. 90, Pls.' Resp. to WCRC Mot. 2, PgID #2800.)

The WCRC admits that it has been involved in such "projects," but claims that its status is that of a contractor and that it is therefore not required to comply with, or it cannot be held liable under, the ADA, the Rehab Act, or the PWDCRA when undertaking such projects. The WCRC has provided the Court with no legal authority to support the proposition that it is exempt from the requirements of, or simply not liable to private suit under, the ADA, the Rehab Act, or the PWDCRA when it undertakes construction, alteration, or maintenance of the PROWs at the request of, or in a joint undertaking with, another governmental entity. WCRC argues, as does MDOT, that it is not responsible for maintaining and improving the sidewalks and other pedestrian thoroughfares in the PROW about which Plaintiffs complain. However, the Plaintiffs have alleged otherwise, and have identified specific projects which WCRC has undertaken or supported that have failed to comply with the ADA regulations regarding accessibility. Even if, as the WCRC argues, Michigan Law, Mich. Comp. Laws § 691.1402a(1), places the responsibility for maintaining sidewalks in reasonable repair on "cities, villages, and townships," and not on the

WCRC, Plaintiffs TAC alleges that in fact the WCRC has assumed that responsibility and has constructed/altered/repaired facilities in the PROW in numerous instances. WCRC provides no law to support the suggestion that a Michigan law attempting to carve out exemptions from immunity for tort liability of certain governmental actors relieves the WCRC from following the commands of the ADA, the Rehab Act, or the PWDCRA, or insulates the WCRC from liability under those acts, when the WCRC assumes the responsibility for constructing, repairing, or altering services, programs, facilities, or activities in the PROWs. Taking the allegations of Plaintiffs' TAC as true, the Court rejects the finger pointing defense that each of the Defendants has, to some degree or another, attempted to interpose at this pleading stage. *See Mote*, 252 F. Supp. 3d at 656 (analyzing the claims against MDOT and WCRC in tandem and noting that "although the County takes some issue with the exact scope of its authority," it does not deny that is has "at least some responsibility" for the relevant right-of-way and "does not deny that it has engaged in at least some construction and maintenance" of the roadway during the relevant time frame). The WCRC has filed in this case an almost verbatim copy of the brief it filed in *Mote*. Those arguments fail here, as they did in *Mote*.

**D.     Plaintiffs' Claim Against the WCRC Under the PWDCRA**

Finally, Plaintiffs allege a claim against WCRC (but not MDOT) under the

Michigan PWDCRA. As Judge Lawson noted in *Mote* in allowing the same claim to proceed there, the PWDCRA "'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'" 252 F. Supp. 3d at 649 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012)). WCRC offers no persuasive argument that would differentiate its response to Plaintiffs' ADA claim from its response to Plaintiffs' PWDCRA claim. All three claims will proceed against WCRC at this stage.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES MDOT's motion to dismiss Plaintiffs' claim against it under the Rehab Act.

As Plaintiffs have stipulated to dismiss their claim against MDOT under the ADA, and the Court DENIES AS MOOT MDOT's motion to dismiss Plaintiffs' claim against it under the ADA.

Further, the Court DENIES WCRC's motion to dismiss in its entirety.

A Scheduling Conference will be noticed.

**IT IS SO ORDERED**.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated:  November 6, 2017

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 6, 2017.

s/Deborah Tofil
Case Manager